Will the clerk please call the next case? 1-24-2584-WC, Source One Staffing, Appellant by Daniel Lovato v. Illinois Workers' Compensation Comm'n et al, Curo Servin Cabrera, Appalee by John Costanza. Mr. Lovato, you may proceed. Thank you, Your Honors, and it's great to see you here for the second time this morning. And for the first time, truly. So this case is quite different than the one we just discussed, and certainly I'm sure you're aware of that. This case involves a review of the decision that we believe and the evidence shows was completely against the manifest weight of the evidence in this issue. What happened in this case, and we don't deny that an incident happened, that's never been an issue, that an did that incident cause Mr. Cabrera's current symptoms. Let me start with what the accident actually was. And what the accident actually was was what he testified to at trial and what could be found in records at the hospital and shortly thereafter. The employee in this matter testified to, and again can be found in the ER records the day of the accident, that he was while moving and another forklift driver came by, bumped into the pallets, which caused him to move forward. He hit his chest against another stack of pallets, and then it's a little unclear, but as the forklift driver seemed to be trying to get out of that position where he just bumped, and as the medical records put it, nudged forward the employee, it seemed to have bumped him again, and at this time the employee then fell to the ground. We don't deny that that happened, Your Honors. Do we know what height he fell from? He fell from a standing position, so he didn't fall off anything. He fell from his feet. He was not on top of the pallets? No, Your Honor. I don't believe he was. I don't believe he testified he was. Okay. And we do know that the stack of pallets that he bumped into going forward is about chest height. Thereafter, that same day, he goes to the emergency room. It describes the fall as that way. He described it as he was nudged forward and then fell to the ground. He does not talk about landing on his shoulder. He talks about landing on his face and his back. He's examined. In fact, he has a completely normal examination of his shoulders and his neck that day. He is diagnosed with a chest contusion and a back contusion. The following day, he goes to get further treatment. At no point does he mention that his neck is bothering him nor his shoulders at this point. Again, at this point, it's still just a chest contusion and a back contusion. It's not. And then a week after the injury, he goes to Tyler Medical. He specifically denies neck pain once more. At no point from a week there was he feeling any neck pain. At this point, it's still just a chest issue and a back issue. And in fact, at Tyler Medical, and you can look in the records yourself, the doctor says that for as far as his other pain that's not regarding his chest or the contusion on his back, he should go see a doctor for these non-work-related injuries. The doctor said that. It's not until about two weeks after the injury when the petitioner goes to see Dr. Ross. To Dr. Ross, the employee now reports that he is having some neck pain. However, the employee also reports now to Dr. Ross that he was struck by a forklift that was traveling 20 miles per hour, completely different from anything he had reported at this point. Completely different to what he reported to the medical, to the ER on the day of, and completely different to what he testified during the trial. And I don't know about you, but I'm not aware of any forklifts in a setting that would travel 20 miles per hour. So anyways, that is what Dr. Ross's understanding of the injury is, that he was struck at 20 miles per hour by a forklift. He also describes a different injury to Dr. Chudnik, and Dr. Chudnik and Dr. Ross are his two treating physicians. To Dr. Chudnik, he discusses how he was crushed in between a stationary object and a loaded forklift. Again, completely different. Do we admit that he was knocked into a stationary object? Absolutely. He was, and as he's described himself, he was nudged into a stationary object. At no point other than to what he described to Dr. Chudnik does he describe being, quote, stuck in between the objects. And again, that's three months after the injury. So now, two months after the injury is what he described that to Dr. Ross. Three months after the injury is when he described it to Dr. Chudnik. Those are the first time that all of a sudden these injuries, rather than just being a simple nudge and fall, are these extremely violent and traumatic injuries. Subsequently, it was also right around that time when his benefits were denied by the treating, the IME doctor, Dr. Stanley. So regarding, and I understand this is really more an issue of causation than it is accident. However, the reason we did put accident in dispute here is because, excuse me, the reason we put accident in dispute here is because the benefits that are awarded, and you can see it in the commission's decision, the arbitrator's decision, which is also upheld by the commission, and then thereafter the circuit court, they rely on the opinions of Dr. Ross. And Dr. Ross as we just described is relying on an injury that didn't happen. He was not struck by 20 mile per hour forklift. That simply never happened. He was nudged by one, sure, and had a slight chest contusion and slight back contusion, absolutely. But he was never struck at such a velocity that the doctor that the commission most relies on understands he was struck by. That simply did not happen. And of course, that brings us to the question of causation. As I've discussed, at no point in the employee did testify to this, he didn't feel immediate neck pain. He didn't feel immediate shoulder pain. He simply had chest and some back contusions when he first did it. It wasn't until a few days later, actually over a week later, when he discusses that he has shoulder pain, and it's not even until two months later when he discusses that he has neck pain. That's why I believe that this causation opinion should have been weighed more heavily with Dr. Stanley rather than Dr. Ross, because Dr. Ross and as well Dr. Shudnick are relying on a version of a story that's clearly much more traumatic and violent than what actually occurred. And when I say what actually occurred, I'm basing it off of, one, his sworn testimony during the trial, and two, if you want to discuss, and I believe the circuit court or commission raised the idea of contemporaneous and when timing and things are said, the most, the two, the way that injury is described most contemporaneous to when it occurred are the ER notes and shortly thereafter when he discusses being nudged, no neck pain, no shoulder pain. I want to discuss a little more about Dr. Ross's side of the fact that he's basing it on an injury that's significantly more violent than actually happened. Dr. Ross at first suspected that there might be radiculopathy in the petitioner's neck. Because of that, he sends him for an EMG. Comes back, there is, the EMG was clean. There was no radiculopathy. He then, he ends up recommending, however, that this should be a fusion surgery. We have testimony from Dr. Ross as well as Dr. Stanley that fusion surgeries are recommended to cure radiculopathy, which Dr. Ross has not only said there is none, he's confirmed it by his own EMG. There is no radiculopathy. Certainly, that the symptoms that the petitioner's feeling are not related to any sort of work injury at this point. There's no objective evidence other than the petitioner saying, I think my neck pain and I think my shoulder pain are related to this, which again, he's changed his story and increased the violence when he's starting to realize that these benefits may not be accepted by the insurance company. All of a sudden, his story becomes significantly more violent than what actually happened. And again, this is backed up by the EMG. And certainly, the date of the IME that Dr. Stanley performed was January 30th of 2020, which was about two months after, the two and a half months after the injury happened. Dr. Stanley opined he was at MMI. That's when we believe all benefits should have been stopped. That's when he had reached MMI at that point. And there should have been no further TTD, no further medical benefits, and certainly not the prospective medical care of a neck surgery that was requested, your honors. Well, counsel, your argument's all fine and good, but in a manifest weight case, we've got a commission that found Dr. Ross more credible. How do we deal with that? Again, well, you deal with it by looking at the manifest weight. And when you look at it, I believe the commission just patently, not to accuse them, but they patently got the decision wrong. The manifest weight shows that Dr. Ross, while I'm sure he's a fine doctor and possibly even a great doctor, and I know he's well-respected, he's basing his opinion on something that didn't happen. I don't know how you can credit a doctor who's basing his opinion on something that simply did not happen, find that person more credible, not to mention if counsel wants to, and he argued it, and the commission discusses it, that our IME doctors, you know, was paid by the respondent in this case. Well, which doctor stands to gain more, the one that's getting paid $1,000 for an IME opinion or the one that's going to be making five figures from doing a cervical fusion? If that's a question of credibility, again, I believe you should be, the manifest weight, excuse me, shows that both Dr. Stanley understands what actually happened in the accident, whereas Dr. Ross was fed a lie, and as far as bias goes, I don't believe when you look at it objectively that you can say that Dr. Stanley is more biased than possibly Dr. Ross is in this case. But it's also a problem, it's also, sorry to cut in, but it's also problematic for you that in finding Ross credible, the commission found Stanley less or not as credible. Right, Your Honor, and that's kind of the point I was trying to address here is I think Pat, the decision is wrong. I don't see how they could have found Dr. Ross to be the more credible one, and I'm not attacking Dr. Ross's character, I would rather the knowledge that Dr. Ross was working with compared to the knowledge that Dr. Stanley was working with. The knowledge that Dr. Ross was working with, he's predicating his opinions essentially on a lie told to him about a significantly more vicious incident than it happened. And then Dr. Ross actually goes and says, okay, well, I'm going to investigate this myself a little bit, orders the EMG, and the EMG confirms that there is no radiculopathy. So I don't see how, given all that, the commission could have found that Dr. Ross was more credible than Dr. Stanley. I mean, you make a good argument based upon what we have before us, but there's this issue of judging the credibility, and that's for the commission. You're asking us to, by your understanding of the facts and this made up speed of the forklift, that all sounds reasonable to me, but there was that credibility issue, and the commission heard from these two doctors and made those findings in a manifest weight case. I think that's still problematic for you, no? It certainly is, Your Honor. And my response to that would be sort of what my response has been is that, yeah, I understand that the commission found them more credible, but when you look at everything objectively and read the testimony and read the records, they simply got it wrong. The manifest weight, and you could say even more than the manifest weight, I would say that the heavy implication is that the commission just felt possibly a little sympathy for this employee because of what he was going through, instead of looking at the objective evidence that would show you that in no world should a doctor who doesn't even understand what actually happened and confirms his own opinions later on with than a doctor that has all the knowledge at his own disposal. Thank you. Your Honor, that really is kind of the meat and potatoes of my argument, as the case is. If there's any more questions now, I'd be more than happy to address them. Any questions from the court? No? Okay. I'm the only question. You'll have time to reply. It's an honor. I have a question. There was a question. I know you were asked this, and I just want to reiterate. You stated that the claimant fell after being struck, nudged, however we want to describe it, by the forklift from a standing position on the floor. Are we certain that it wasn't that he was at least on a single pallet, if not more? Yeah, Your Honor. I'd have to re-read his testimony. I believe he testified that he was standing maybe on one to two pallets. My understanding was that he was standing on the floor. I don't think the height he was at really changes the analysis in this case. Had he been standing on one or two pallets, it's a negligible height, considering he was nudged forward off the pallet and then fell backwards from standing. Sure. I appreciate that answer. The final question I'll have for you is whether or not the injuries sustained by the claimant were caused by the forklift, the actual striking by the forklift, or were any of them attributable to the fall as well? I believe that it's kind of hard to answer your question because the understanding and how he testified is that it kind of happened so quick that you could say the chest contusion that he suffered might have been originally caused by the forklift bumping into him because that's when he testifies he goes forward and hits his chest. And then the contusion he sustained to his back, which again never mentions shoulder or neck pain until a few months after, that could be caused by the fall. However, I don't think at any point you can argue that what he's feeling in his neck or his shoulders is caused by either one. Okay. Well, and I know that there's a contention about 20 mile per hour forklift being struck by, I drove a forklift in college for a little while and I don't recall them going 20 miles per hour because if they could, I would have probably tried it. But hitting any, being hit by a forklift on any part of the forklift at even 10 miles per hour, but 20 miles per hour would be a fairly significant injury for certain. So yeah, yeah, absolutely. And I agree with you, except for the fact that his testimony is that he was nudged. It wasn't that, hey, I was rammed, I was smacked by this thing. I was nudged forward. That's his testimony and that was his report to the doctors as well at the ER. So you bring that up and I said that was my last question. I'll have one follow-up based on what you just said. The verbiage, the terminology that the claimant a Spanish-speaking claimant, if I understand that correctly, to have been nudged, are there any nuances between the Spanish language and English language, the translator that could maybe give some clarity as to what his idea of a nudge was or was it truly the word translators and we start using other languages. I think some of that can be confusing to both the claimant who is the reporter and the receiver of that information, be it the doctor, the court, whoever. So do we know when he went to the doctor, was there a translator needed at the doctor's office? Did he have a translator? Did the doctor speak Spanish, any of that thing? Your Honor, I'm not going to represent to you that I know the answer to that question. I can represent to you that when he reported to Dr. Ross, which is when all of a sudden this forklift is going 20 miles per hour, he did have a translator there and Dr. Ross actually testified that there was no language barrier or miscommunication barrier whatsoever. As far as the ER goes, we didn't depose those people. I'm not sure whether there was a translator there. However, what I can say on my very limited knowledge of the Spanish language is that in probably all languages for that matter, I believe you would be able to represent even to someone that's maybe it's a nurse that just speaks Spanish, the difference between being nudged and being hit by 20 miles per hour. I don't think that's really a gray area. I think it's a pretty black and white description, whether you're speaking Spanish, English, French, Italian, whatever you may be speaking. The testimony, his report of being nudged, that was definitely from the ER, correct? That's where you use that terminology. Okay. All right. Thank you. Very good. If you'll have time in reply, Mr. Castaneda, you may respond. Oh, thank you, Your Honor. May it please the court, Counsel Lovato. My name is John Castaneda. I'm here on behalf of the epilee, Cyril Servin Cabrera. Your Honors, the crux of this case is really the medical causation issue as to whether or not Mr. Cabrera's injuries that he suffered to his bilateral shoulders and cervical spine might or could be causally related to his accident October 14, 2019, by a preponderance of the evidence. And certainly, this gentleman suffered an accident. In fact, appellant's first sentence of their brief is, they agree Mr. Cabrera was knocked down. So I want to address that portion of the case initially, because I think that was something that the appellant decided to dispute at the trial once they found a one-sentence report in the ER that says that he gave a history of being nudged. And I would submit to this court that that history is in total opposite to the rest of the history, including his report of injury given at the trial. And normally, you're not going to hear or read a report of injury at trial unless it's helpful to the employer. In this case, the report of injury wasn't even admitted into evidence, but it was read into the record. And what Mr. Cabrera said in his report of injury was that he was putting together these pallets when a co-worker was driving a pallet jack and accidentally hit the pallets. The pallets hit him on his feet and he landed on the pallets. And before he was able to get up, the driver went around again and hit them again and he landed on the floor. Now, I submit to this court that that is not a nudge. A nudge is not going to cause you to fall from a standing height and face plant on the pallet if you are nudged. It's not a push. It's not a gentle tap. It is a pallet electronic motorized pallet jack striking these pallets, causing this man to fall. Now, the records that were admitted into evidence also support this description. If you look at the nurse's notes. Counsel, let me ask you a question. Maybe I misunderstand. So this is not a forklift? This is not a forklift, your honor. It's a pallet jack which is the operator is basically on the floor. Yes, it's an electronic motorized pallet jack. Right, it's used to move pallets or particularly pallets that have objects, weighty objects on them. Correct. Okay, I just was clear because we got forklift somehow in here. Well, I think again this is a language issue where my client is describing it as a forklift and it's really a pallet jack as he described that testimony. The nurse at the emergency room, the same place where the doctor wrote nudge and said that my client had mild pain, the nurse, the intake nurse said the history that she wrote down was that my client was at work when he got pushed by a forklift driver, fell backwards on the wooden pallets, got up, lost his balance, and fell forward onto wooden pallets. It was complaining of torso pain and head pain and was a standing height before he fell. He also told the nurse his pain was eight out of ten and she wrote down back and chest pain from a fall. This is certainly different from what the doctor wrote later on in the same visit that he was nudged and he had mild pain. Then you look at the physician's immediate care records which were the same day of the accident and there his history is. He's here post-accident. He got injured yesterday by a forklift driver, hit him with some pallets two times. First time he fell straight forward, second time he fell on the right side, and then two days later the employer sends him to Tyler Medical Services. So this is their clinic. They're sending him for treatment and at Tyler Medical he states in the history that he is evaluated for an injury to his head, his left shoulder, and his chest. Two days ago on October 14, 2019 he was struck by an electronic pallet jack at work. He fell striking the right side of his face, left shoulder, and chest area. The pain is on the right side of the face, left shoulder, and chest pain. Then 14 days later at the same clinic he then is complaining of neck pain and Dr. Pappas is noticing that the pain is radiating down his arm from the neck. This is the first symptom that we see relating to his neck which can demonstrate cervical radiculopathy. So I submit to the court that really the reason accident was put in dispute was because that one physician in one note wrote that he was nudged which is certainly not the case here. The commission properly found that the contemporaneous medical records indicated the type of mechanism of injury that occurred to Mr. Cabrera who is 64 years old at the time of this incident where he is his this pallet jack strikes the pallets causing him to fall forward face plant on the pallet and then struck again and fall again to the ground. It does take a couple weeks for the next symptoms to come about but that is certainly not inconsistent with how he is describing what happened to him on this date and their argument is mainly that he was nudged and that's just not consistent with the majority of the evidence and the evidence supports the commission's finding that that is how the accident occurred as described by Mr. Cabrera. When I questioned I strike that when when the pallets council questioned Dr. Stanley about the mechanism of injury Dr. Stanley was asked if question if you learn Mr. Cabrera is reporting he was struck by a loaded stand-up pallet jack traveling an estimated 20 miles per hour thrown chest first into pallets and then twisted onto his side would this more detailed mechanism of injury change your opinion in any way Dr. Stanley said no I was aware of that more detailed history based on the records from Tyler Medical Services. Now certainly Mr. Cabrera doesn't know the speed of the pallet jack nobody would know that and I don't think he would know that but that was something that he indicated trying to give a picture of this pallet jack and how quickly it struck these pallets. Appellants council also asked Dr. Alpert the other section 12 examiner what did Mr. Cabrera tell you concerning his relevant history Dr. Alpert said he states on 2019 he was in a factory and a person with a pallet jack hit him he fell on top of the pallet pile he fell onto his right side and the right side of his neck hit the pallet his right arm was behind his back and his chest hit the floor. I submit to this court that this accident as described by Mr. Cabrera is sufficiently descriptive in terms of how he fell on the date of the accident was he was he aware that the pallet jack was going 20 miles an hour no of course not was he aware that this happened in a very quick and swift manner yes of course he was standing in the next moment he's face planted on the pallets I would submit that the commission could reasonably find that his description was an accident that arose out of and in the course of his employment as I said I think the crux of the case is is there sufficient medical evidence to support the commission's finding of a causal connection between his injuries and this accident Dr. Ross the treating neurosurgeon board certified indicated in his deposition that his opinion is that there is a causal connection between Mr. Cabrera's neck condition and this work accident yes he originally thought there might be cervical radiculopathy based upon the radiation of numbness then he did an EMG found out that that was negative but he continued to find during future MRIs that Mr. Cabrera's cervical spinal stenosis and myelopathy was getting worse as a result of this condition in his neck Mr. Cabrera was asymptomatic prior to this accident he had no other accidents or injuries and it was only after this accident within a two-week period that he began to complain of neck pain and radiation down into his arms Dr. Ross testified that it was based on those circumstances that he found that there was a causal connection between his condition and the injury the fact that a particular part of the history regarding the speed of the forklift does not defeat that opinion he is basing it on the asymptomatic condition of Mr. Cabrera the trauma he suffered and the subsequent complaints that come came from his cervical condition as well as his shoulder condition during cross-examination of Dr. Stanley I asked the following question is it fair to say that you agree Mr. Cabrera suffered trauma to the shoulders just not to the extent of rotator cuff tears Dr. Stanley said yes what is described in the Tyler Medical Records is a left shoulder contusion I then asked Dr. Stanley do you also agree Mr. Cabrera suffered a neck injury involving a temporary exacerbation of pre-existing arthritis and stenosis that developed into radicular symptoms and weakness in the upper extremities but that these conditions had resolved at the time of your examination is that correct Dr. Stanley answered yes actually I thought they had resolved even prior to my evaluation because when he saw Dr. Ross it wasn't clear that he had evidence of cervical radiculopathy and as the commission noted in their decision Dr. Ross actually thought Cabrera had cervical radiculopathy at the initial visit Dr. Stanley also noted in his opinion that he thought he thought Mr. Cabrera was at MMI he never saw any of the future MRIs and as this court has said in Dukic this court may affirm the commission's decision on any basis supported by the record regardless of the commission's finding or its reasoning Dr. Stanley never had the benefit of the future MRIs of the cervical spine which showed further degeneration and myelopathy Dr. Alpert by the way wrote a report which was appellate's exhibit two to the deposition of Dr. Alpert and in that report that was dated October 18 2021 Dr. Alpert was asked does Mr. Cabrera exhibit any symptom magnification malingering or non-organic pain signs regarding these injuries Dr. Alpert's answer was his main complaints are shooting pain down both of his arms with numbness and tingling and neck pain which are all consistent with cervical radiculopathy or cervical myelopathy as opposed to a shoulder pathology in my opinion and on page not page eight he was asked what is the current status and diagnosis of Mr. Cabrera Dr. Alpert answered current diagnosis is right-sided cervical radiculopathy referred to his right shoulder and finally he was asked do you feel additional treatment is medically necessary Dr. Alpert wrote I recommend he gets his neck surgery as recommended by Dr. Ross the commission's reliance on Dr. Ross's well-reasoned and evidence-based opinion is entirely appropriate the finding of causal connection is supported by the manifest weight of the evidence Mr. Cabrera sufficiently proved by the medical evidence he is entitled to temporary total disability benefits and medical including prospective medical care for the surgery recommended by Dr. Ross may I entertain any questions any any questions from the court thank you thank you Mr. Lovato you may reply here your honor first I want to just kind of reply to a point that council made at the beginning which was that this is a really a case of causation rather than accident and truthfully I agree I do understand the nuance that my colleague was going for when he put accident into question that being what accident really happened and I think we've explored that a little bit I would agree with Mr. Castaneda that that probably does go more to the idea of causation than it does to the idea of accident but even during Mr. Castaneda's argument he pointed out a few things that that go to discredit the idea that this extremely violent uh this extremely violent 20 mile per hour pallet jack injury caused such such symptoms uh first of all we've we've harbored and during my argument we discussed often about what actually did happen um council read into uh the the record just then the testimony um he chalked it up to language disputes which we explored as well I don't believe that's a truly valid excuse to why all of a sudden once the benefits are denied all of a sudden his injury becomes significantly more traumatic and violent I think a better explanation would be that he had and and as council put in his own and Dr. Ross says pre-existing symptoms that all of a sudden are getting worse and and when I say all of a I mean about two weeks to a month after the injury occurred um he talked about Dr. Alpert giving an opinion as to neck surgery Dr. Alpert plainly admits he's not a spine surgeon he was there to and uh look at the petitioner's shoulders which he objectively said no for the treatment as to the shoulders he might have said he may have suffered a left shoulder contusion and that would be it um Dr. Ross has not pulled himself out to be a next a neck surgeon or a spine doctor I believe if you look at the record Dr. Ross was saying it's essentially his understanding that when there is radiculopathy which she's only basing on the petitioner's complaints um but that is a valid reason for a neck surgery and fusion now if you take that in conjunction with what Dr. Ross the treating physician uh has one testified to and in two found objective evidence there is no radiculopathy so Dr. Alpert's point is that that's his kind of his general understanding but it's not applicable in this case as Dr. Ross has said there is no radiculopathy based on one is his you know examination of Mr. Cabrera and two the EMG that showed there is absolutely no radiculopathy to recommend surgery then based on essentially a non-credible witnesses subject subjective complaints I think is just wrong it's not causally connected um Dr. Ross in council just now talked about how there was pre-existing stenosis and my my allopathy I'm probably not saying that correctly um but again the point being that it's it's pre-existing council said multiple times during his argument just now it's a degenerative condition at no point did he mention this is a key this is an acute condition I don't see how when it's degenerative complaints don't start until after well after the injury the injury is in question and seems to get more violent once the insurance company stopped allowing benefits I don't see how that could be found to be a true causal connection when again even Dr. Ross's main opinion that the surgery is connected because of radiculopathy is directly uh excuse me contradicted by Dr. Ross's own testimony and his own objective findings and the EMG findings I believe I've addressed everything I want to address here if you uh any of your honors has a final question for me I'd be more than happy to answer any questions from the court for counsel okay uh hearing none thank you counsel both for your arguments in this matter this morning it will be taken under advisement and a written disposition shall issue this time the clerk will escort you both out of our remote courtroom and we'll proceed on to the next case have a happy you too merry christmas